**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **CONNIE HURTE, o/b/o C.S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 1:10cv0119 SNLJ** |
| | ) | **TCM** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (the Commissioner), denying the application for supplemental security income benefits (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383b, filed on behalf of C.S. (Plaintiff) by her mother, Connie Hurte, is before the undersigned for a review and recommended disposition. Plaintiff has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

**Procedural History**

Ms. Hurte applied for SSI on Plaintiff's behalf in April 2006, alleging Plaintiff was disabled as of March 2003 due to attention deficit hyperactivity disorder (ADHD), bipolar disorder, and manic depression. (R.[1] at 83-86.) This application was denied initially and following an administrative hearing in November 2007 before Administrative Law Judge

---

[1] References to "R." are to the administrative record electronically filed by the Commissioner with his answer.

(ALJ) Craig Ellis.  (Id. at 8-19, 22-46.)  The Appeals Council denied her request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Ms. Hurte and Plaintiff testified at the administrative hearing.  Ms. Hurte was aware that she could retain counsel, but chose to proceed without representation.[2]

Ms. Hurte testified that she and Plaintiff lived with Ms. Hurte's boyfriend, her mother, and her two sons.  (Id. at 26-27.)  Her oldest son is twelve years old; her youngest son is ten; and Plaintiff is nine.  (Id. at 27.)  Neither she nor her boyfriend work outside the home.  (Id.)  She is disabled by bipolar disorder, depression, and anxiety, and she receives Social Security benefits.  (Id. at 27-28.)

Ms. Hurte explained that she applied for SSI for Plaintiff because she has ADHD, bad depression, bipolar disorder, and, they recently found out, islet cell.[3]  (Id. at 28.)  Ms. Hurte described the disorder as being a combination of Type I and Type II diabetes.  (Id. at 29.)  Plaintiff had an appointment with a specialist the following September.  (Id.)

---

[2]In October 2006, thirteen months before the hearing, an attorney had filed an appointment of representative signed by Ms. Hurte.  (Id. at 73-74.)  The notices of hearing and related matters apparently went only to Ms. Hurte.  She retained new counsel after the ALJ entered his adverse decision.  (See id. at 5-6.)  This counsel represented Plaintiff before the Appeals Council.  A third counsel is representing Plaintiff in these  proceedings.

[3]Although Ms. Hurte did not further describe Plaintiff's islet cell condition, a later report indicates that it was an islet cell tumor, defined as "[a] mass of abnormal cells that forms in the endocrine (hormone-producing) tissues of the pancreas.  Islet cell tumors may be benign (not cancer) or malignant (cancer)."  National Cancer Institute, Islet Cell Tumors (Endocrine Pancreas), http://www.cancer.gov/cancertopics/types/isletcell (last visited May 18, 2011).

Asked if Plaintiff was receiving any mental health treatment, Ms. Hurte explained that they had moved and she was trying to get Plaintiff "in with the psychiatrist." (Id. at 30.) For the time being, Plaintiff's primary care physician was taking care of her medications.. (Id.) This physician was also trying to find a specialist to treat Plaintiff's central auditory processing disorder. (Id.) They were having difficulties finding a specialist who would take Medicaid. (Id. at 31.)

Plaintiff testified that she goes to Lake Road School. (Id. at 32.) She listed her new address and her home telephone number. (Id.) Asked what she would do if she and her mother were at home by themselves and her mother broke her leg and could not get up, Plaintiff stated that she would call 911 for an ambulance and tell them that her mother fell down, broke her leg, and needed to go to the hospital. (Id. at 33.)

Plaintiff is in fourth grade. (Id.) She has not needed to repeat a grade. (Id.) She takes a school bus. (Id.) She has never been suspended from riding the bus, but has been suspended from school. (Id. at 34.) She did not know what grade she had been in when suspended; Ms. Hurte testified that it was in first grade and was for stealing from the teacher and the principal. (Id.) She further testified that Plaintiff had been suspended from riding the school bus "numerous times." (Id.) Plaintiff also had been suspended for three days from the boys and girls club. (Id.) Ms. Hurte thought this suspension had been when Plaintiff was in third grade. (Id.) Plaintiff explained that she had thrown a little girl off the table because the girl would not leave her alone and "she was stupid." (Id. at 35.)

Plaintiff testified that she has a best friend. (<u>Id.</u>) She sees her friend at the boys and girls club. (<u>Id.</u>) They play and talk together. (<u>Id.</u>) Asked if she has any problems other children her age do not, Plaintiff replied that she does – she is "fat." (<u>Id.</u> at 35-36.) Two other children in her class are also. (<u>Id.</u> at 36.) She thinks her teacher is mean but other children do not. (<u>Id.</u>) She has gym class once a week for thirty minutes. (<u>Id.</u>) The class is always inside. (<u>Id.</u> at 37.) She misses gym if she is behind in her work; other children do also. (<u>Id.</u>) Her grades vary and include a "F." (<u>Id.</u>) She gets poor grades because she cannot read or spell. (<u>Id.</u>) Her teacher does not care about spelling and Plaintiff "ha[s] no clue how to read." (<u>Id.</u> at 37-38.) She thinks her reading and spelling problems are her teacher's fault. (<u>Id.</u> at 38.)

## Medical, School, and Other Records Before the ALJ

The records before the ALJ included reports Ms. Hurte completed as part of the application process, school records, and medical records.

When applying for SSI for Plaintiff, Ms. Hurte completed a Disability Report. (<u>Id.</u> at 101-09.) Plaintiff was 4 feet tall and weighed 126 pounds. (<u>Id.</u> at 101.) She received special education services and was in speech therapy.[4] (<u>Id.</u> at 107.)

On a Function Report form for children ages six to twelve, Ms. Hurte reported that Plaintiff wore glasses or contact lenses, but did not have any problems hearing. (<u>Id.</u> at 89.) She did not have problems talking clearly. (<u>Id.</u> at 90.) Her ability to communicate was

---

[4]There is a later reference to Plaintiff being in small reading groups. There is no other reference to speech therapy. Indeed,, the therapist listed reported that Plaintiff had no speech difficulties. <u>See</u> page 18, infra.

limited in that she did not repeat stories she had heard or accurately tell jokes or riddles. (Id. at 91.) Her ability to deliver telephone messages, explain why she did something, talk with family and friends, and use sentences with "because, "what if," or "should have been" was not limited. (Id.) Her ability to progress in learning was not limited, nor were her physical abilities. (Id. at 92-93.) Her impairments affected her ability to play team sports, but not her abilities to make friends her own age, make new friends, or get along with her mother, school teachers, or other adults. (Id. at 94.) Her impairments did not affect her ability to help herself and to cooperate with others in taking care of her personal needs. (Id. at 95.) Her ability to pay attention and stick with a task was limited in that she did not keep busy on her own, finish things she started, complete her homework, or complete her chores most of the time. (Id. at 96.) She was easily bored. (Id.)

Ms. Hurte completed a Disability Report – Appeal form after the initial denial of Plaintiff's SSI application. (Id. at 113-19.) Plaintiff's doctor had stated that she had attention deficit disorder (ADD), and not ADHD. (Id. at 114.) She was not taking care of herself and had to be reminded to change her clothes and take a shower. (Id. at 117.)

In October 2007, the month before the hearing, Ms. Hurte reported that Dr. Fernando had advised her that Plaintiff had problems with her insulin and her cells in her pancreas were dying. (Id. at 122-23.)

Plaintiff's school records before the ALJ begin with an evaluation of Plaintiff when she was in the second grade. (Id. at 124-59.) The following were concerns about Plaintiff: she did not seem to understand what was said at school; she was distractible; she learned

slowly; she seemed sad; and she had a short attention span. (<u>Id.</u> at 127.) Aggression and getting along with family and friends were not concerns. (<u>Id.</u>) Her second grade teacher rated[5] Plaintiff's behaviors in nine categories: listening comprehension; oral expression; written expression; basic reading skills; reading comprehension; mathematics calculation; mathematics reasoning; general; and behavior. (<u>Id.</u> at 130-34.) Of the nineteen problematic behaviors listed for listening comprehension, Plaintiff occasionally exhibited four, frequently exhibited eleven, and continuously exhibited four. (<u>Id.</u> at 130.) In the area of oral expression, Plaintiff frequently exhibited six of the twelve problematic behaviors and continuously exhibited the other six. (<u>Id.</u> at 131.) In the area of written expression, Plaintiff frequently exhibited nine of the sixteen problematic behaviors and continuously exhibited seven. (<u>Id.</u>) Plaintiff occasionally exhibited six of the problematic behaviors in the category of basic reading skills, frequently exhibited three, and continuously exhibited thirteen. (<u>Id.</u> at 132.) In reading comprehension, she frequently exhibited eight of the thirteen problematic behaviors and continuously exhibited five. (<u>Id.</u>) Plaintiff did not have one of the eight problematic behaviors listed for the area of mathematics calculation. (<u>Id.</u> at 132-33.) She had an occasional problem with three behaviors and a frequent problem with four. (<u>Id.</u>) In mathematics reasoning, she had an occasional problem with one and a frequent problem with the remaining two behaviors. (<u>Id.</u> at 133.) The general category included such behaviors as not remaining on task, having difficulty concentrating, and failing to demonstrate logical

_____

[5]The rating was on a four-point scale: a one was "not a problem"; a two was "occasionally"; a three was "frequently"; and a four was "continuously." (<u>Id.</u> at 130.)

thinking.  (Id.)  Plaintiff had an occasional problem in two of the behaviors:  not performing or completing classroom assignments during class time and not turning in homework assignments.  (Id.)  She had a frequent problem in ten of the remaining twelve behaviors and a continuous problem in two of those behaviors.  (Id.)  Plaintiff did better in the behavior category.  (Id. at 134.)  She had no problem in ten of the twenty specific behaviors listed; an occasional problem in six; and a frequent problem in four.  (Id.)

As part of the evaluation, Plaintiff was given, and passed, a hearing test and, wearing glasses, a vision test.  (Id. at 135.)  It was noted that she was overweight, taking three daily medications (Fluoxetine HCL (Prozac); Abilify, an antipsychotic drug; and Senna-gen (for constipation)), and had high blood pressure and high cholesterol.  (Id.)  Ms. Hurte reported that Plaintiff had ADHD, bipolar disorder, and depression.  (Id.)  Her general motor skills were below normal due to her weight.  (Id.)  Her articulation, voice, and fluency were adequate for oral communication; her expressive and receptive language skills were comparable to her peers.  (Id. at 135-36.)  Her cognitive abilities were "significantly below her peers."  (Id. at 136.)  Her adaptive skills were within a normal range.  (Id.)  She was observed as having a negative attitude and an opinion that she could not read; she reported that her mother wanted her in special education classes.  (Id.)  Her first quarter grades included a C- in reading, language, and math and a D+ in spelling.  (Id. at 137.)  She attended a small reading group outside the classroom.  (Id.)  Several behavioral modifications were implemented for one to three weeks; the degree of success was inconsistent.  (Id. at 138-39.)  The modifications included such strategies as frequently repeating directions,

allowing her extra time to respond to questions and directions, assigning her a buddy, acknowledging appropriate behavior, and ignoring inappropriate behavior. (Id.)

Also as part of the evaluation, Plaintiff was given the Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV), the Wechsler Individual Achievement Test – II (WIAT-II), the Behavior Evaluation Scale–3 (BES-3rd), and the Behavior Evaluation Scale–2 (BES-2nd). (Id. at 142-48, 150-52.) On the WISC-IV, Plaintiff had a full scale intelligence quotient (IQ) of 105, placing her in the average range of intelligence. (Id. at 143.) On the nine subtests of the WIAT-II, Plaintiff was weakest in written expression (she was 0.87 standard deviations below the mean) and oral expression (she was 1.00 standard deviations below the mean). (Id. at 147-48.) She was strongest in pseudoword decoding and listening comprehension; in each of these two subtests, she was 0.07 standard deviations below the mean. (Id.) Her total composite score was 0.87 standard deviations below the mean. (Id. at 148.) Plaintiff's mother's responses to the BES-2nd placed Plaintiff in the "very poor" range for each of the subscales: learning problems; interpersonal difficulties; inappropriate behavior; unhappiness/depression; and physical symptoms/fears. (Id. at 151-52.) Her composite score was also in the "very poor" range. (Id. at 152.)

Her second grade teacher observed that Plaintiff enjoyed math and liked to participate in class. (Id. at 149.) She was below level in reading. (Id.) She had a negative attitude and a lot of excuses; she received little support at home for reading. (Id.) She had trouble making friends, and would push, bother, grab, or kiss boys on the playground. (Id.) She played well with first grade girls or boys that were smaller than she. (Id.) Classroom

observations the month before, in September 2005, by the school counselor, included that Plaintiff interacted well with her peers and the teacher; talked quietly with children; and did everything asked of her in a positive manner. (Id. at 154.) She was organized, but became distracted a few times while trying to complete her work. (Id.) She had difficulty reading, as did most of the other students in her reading group. (Id. at 155.) The counselor also observed Plaintiff during recess. (Id. at 156-57.) She played with several children during recess, but did not keep her hands to herself as the playground rules required. (Id. at 157.) At one point, she picked up a boy and passed him to another girl. (Id.)

The evaluation team decided that Plaintiff did not meet the eligibility criteria for a special education diagnosis and services. (Id. at 158.)

Plaintiff's fourth quarter grades for the second grade were Bs in language and math, a B+ in reading, and a C+ in spelling. (Id. at 171.) This was an improvement from the Cs and Ds she received the first two quarters. (Id. at 172.) Plaintiff's teacher had written Ms. Hurte at the end of the second quarter that Plaintiff would benefit from extra reading help at home. (Id.) She was capable of doing better, but needed help and more encouragement at home. (Id.)

Plaintiff's relevant medical records before the ALJ are summarized below in chronological order.

On July 28, 2004, Plaintiff's pediatrician, Joseph Fernando, M.D., prescribed 10 milligrams of Prozac, an antidepressant, for her. (Id. at 297.) Her activity and peer

involvement were within normal limits.  (<u>Id.</u>)  Her weight, then at 96 pounds, was a concern.

(<u>Id.</u>)

Plaintiff had an intake assessment at the Family Counseling Center on October 7.  (<u>Id.</u>

at 240-52.)  Ms. Hurte reported problems with Plaintiff not listening or paying attention.  (<u>Id.</u>

at 241.)  She rated these problems as moderate and present for the past year.  (<u>Id.</u>)  Of the

eighteen symptoms listed for a diagnosis of ADHD, Plaintiff had two.  (<u>Id.</u> at 242.)  She had

none of the symptoms of oppositional defiant disorder, conduct disorder, or separation

anxiety disorder.  (<u>Id.</u> at 242-43.)  She had four of the nine symptoms of major depressive

disorder.  (<u>Id.</u> at 243.)  Plaintiff ate all the time.  (<u>Id.</u> at 247.)  When Plaintiff got into trouble

at home, her mother sometimes talked to her and sometimes spanked her.  (<u>Id.</u> at 241, 249.)

The diagnosis was depressive disorder, not otherwise specified.[6]  (<u>Id.</u> at 251.)  Her Global

---

[6]According to the Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual</u> (4th ed. Text Rev.)
(DSM-IV-TR), each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise
Specified" category.  <u>DSM-IV-TR</u> at 4.  This category may be used in one of four situations:  (1)
"[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class,
but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he
presentation conforms to a symptom pattern that has not been included in the DSM-IV but that
causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either
insufficient data collection or inconsistent, contradictory information, although the information that
is known is sufficient to place the disorder in a particular diagnostic class.  <u>Id.</u>

Assessment of Functioning[7] (GAF) was 55.[8]  (Id.)  She was to be referred to Ravdeep

Khanuja, M.D., a psychiatrist, with the Family Counseling Center.  (Id. at 252.)

Plaintiff's cholesterol levels were tested in November.  (Id. at 295.)  Her low-density

lipoprotein (LDL) was 145; her total cholesterol was 204.  (Id.)

On December 8, Plaintiff saw Dr. Khanuja.  (Id. at 258-60.)  Plaintiff had been taking

Prozac for the past one and one-half years.  (Id. at 258.)  Her doctor, Young Walker, had

increased the dosage to 20 milligrams a few months earlier.  (Id.)  Ms. Hurte reported that

Plaintiff had then become more argumentative and had increased behavior problems at

school.  (Id.)  She had reduced the dosage by half.  (Id.)  Ms. Hurte was now concerned that

Plaintiff's depression had increased since she had reduced Plaintiff's dosage.  (Id.)  Ms. Hurte

had a history of bipolar disorder.  (Id. at 259.)  Plaintiff older brother, then age nine, had

bipolar disorder.  (Id.)  Her other brother, age seven, had depression and ADHD.  (Id.)  On

examination, Plaintiff was pleasant, appropriately answered questions, had normal

psychomotor activity, had a good mood, was not agitated, had fair judgment and insight, and

had a normal rate and volume of speech.  (Id.)  The diagnosis was mood disorder, not

---

[7]"According to the [DSM-IV-TR] the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).

[8]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

otherwise specified.  (Id. at 259.)  A depressive disorder was to be considered compared to bipolar disorder.  (Id.)  Dr. Khanuja rated Plaintiff's GAF as 50.[9]  (Id. at 260.)  Dr. Khanuja prescribed a 15 milligram dosage of Prozac, cautioned Ms. Hurte about its potential side effects, and told her of the recent warnings about antidepressant use by children.  (Id.)  Plaintiff was to be referred to psychotherapy and to return to Dr. Khanuja in one month.  (Id.)

The next week, Ms. Hurte reported that Plaintiff had recently been suspended from school for stealing, but was able to tolerate the 15 milligram dosage of Prozac.  (Id. at 257.)

Because of her hyperlipidemia (elevated levels of lipids), Dr. Fernando referred Plaintiff to the Department of Internal Medicine at the Washington University School of Medicine.  (Id. at 219-25.)  She was seen by Ann Goldberg, M.D., on February 2, 2005.  (Id.)  Plaintiff was described as healthy and growing well.  (Id. at 219.)  She was also overweight, and had been since the age of three to four years.  (Id.)  She ate breakfast and lunch at school.  (Id.)  She had gym at school once a week.  (Id.)  Her family had a history of high cholesterol and premature coronary artery disease.  (Id. at 222.)  Dr. Goldberg noted that Plaintiff engaged in little activity, overate, and had a diet that was high in sugar and fat.  (Id.)  She discussed food and exercise with Plaintiff, her mother, and her grandmother.  (Id.)  Plaintiff's cholesterol levels were 204; her high-density lipoprotein (HDL) was 40; her LDL was 145.  (Id.)  She was to have laboratory work done in June.  (Id.)

_____

[9]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34 (emphasis omitted).

One week later, Plaintiff returned to Dr. Khanuja. (<u>Id.</u> at 256.) Ms. Hurte reported that Plaintiff had been irritable and impulsive. (<u>Id.</u>) She had been in trouble for fighting on the school bus. (<u>Id.</u>) Her affect was somewhat depressed; she appeared to be bored. (<u>Id.</u>) Dr. Khanuja noted that Plaintiff's symptoms could reflect bipolar disorder. (<u>Id.</u>) A 5 milligram dosage of Abilify was prescribed. (<u>Id.</u>) Due to its tendency to cause weight gain and cholesterol problems, both of which Plaintiff already had, Plaintiff was to be closely monitored and return in two months. (<u>Id.</u>)

When Plaintiff returned to Dr. Khanuja on May 4, she had gained weight. (<u>Id.</u> at 255.) She was doing very well in terms of behavior problems, but was eating excessively and binging. (<u>Id.</u>) Her dosage of Prozac was increased; her dosage of Abilify was continued. (<u>Id.</u>) She was to be referred to psychotherapy. (<u>Id.</u>)

Plaintiff saw Dr. Fernando on May 18 for a regular examination. (<u>Id.</u> at 208-09, 293-94.) Her height was 4 feet 2.5 inches; her weight was 114 pounds. (<u>Id.</u> at 208, 293.) It was noted that she had a history of high cholesterol and that she should have a fasting test for her cholesterol levels. (<u>Id.</u>) She had a diagnosis of bipolar disorder. (<u>Id.</u>) Her medications included Prozac and Abilify. (<u>Id.</u>) Her activities included bike rides and a walk every week with her case manager. (<u>Id.</u>) She liked to argue. (<u>Id.</u> at 209, 294.) It was also noted that things were okay. (<u>Id.</u> at 208, 293.)

Plaintiff next saw Dr. Khanuja on July 6. (<u>Id.</u> at 254.) She was not having any behavioral problems and was not binging as much. (<u>Id.</u>) Her cholesterol was below 200.

(Id.)  Her dosage of Prozac was increased to 30 milligrams to further decrease the binging, which appeared to be compulsive.  (Id.)

Three weeks later, Plaintiff was seen by Jyotsna Nair, M.D., a child psychiatrist.  (Id. at 234-35.)  It was reported that Plaintiff had been stealing from the school principal and stealing supplies; the stealing had stopped when she was placed on Abilify.  (Id. at 234.)  She was picked on at school for being overweight; the teachers did nothing to make it stop.  (Id.)  She ate a lot and was gaining weight.  (Id. at 235.)  Her cholesterol levels had dropped on Abilify.  (Id.)  She slept well.  (Id.)  She could not go outside to play; she watched television and played videogames.  (Id.)  Boys would call her names.  (Id.)  It was noted that Plaintiff's mother was bipolar and that there was a history of bipolar on both sides of her family.  (Id.)  She had observed her biological father abuse her mother when she was younger.  (Id.)  After the forty-minute session, Plaintiff was diagnosed with post-traumatic stress disorder (PTSD) and major depressive disorder, recurrent.  (Id.)  Dr. Nair rated her GAF as 50.[10]  (Id.)

Plaintiff returned to Dr. Goldberg on November 9.  (Id. at 214-18.)  It was reported that a number of changes had been made in Plaintiff's diet since the February visit; however, her weight had increased and was 56.6 kilograms, or 124.5 pounds.  (Id. at 215.)  She complained of being hungry all the time and of fatigue.  (Id.)  She also had migraines.  (Id. at 218.)  Her cholesterol levels were higher.  (Id.)  It was noted that Plaintiff's mother and grandmother did not have the name, address, or phone number of Plaintiff's psychiatrist.  (Id.)

---

[10]See note 9, supra.

When Plaintiff next saw Dr. Nair, in December, she reported that she was called fat by boys.  (Id. at 233.)  In return, she would jump on them and kiss them.  (Id.)  A counselor was working with her on her behavior.  (Id.)  Plaintiff was started on Zoloft, prescribed for the treatment of obsessive-compulsive disorder in children of Plaintiff's age,[11] and continued on Abilify.  (Id.)

When Plaintiff next saw Dr. Nair, on January 5, 2006, her mother reported that she was eating constantly when taking the Abilify.  (Id. at 232.)  She had gained a lot of weight. (Id.)  On examination, Plaintiff was pleasant, calm, and quiet, although she fidgeted at times. (Id.)  The dosage of Abilify was to be tapered for a week and then stopped.  (Id.)  The Zoloft prescription was renewed.  (Id.)

Ms. Hurte reported to Dr. Khanuja on March 28 that Plaintiff's medication had been changed by Dr. Nair because Plaintiff had been unable to pay attention in class and had been hyperactive.  (Id. at 253.)  She was doing better in school on the current medication.  (Id.) Her focus and concentration had improved; her mood was good.  (Id.)

Plaintiff had a regular examination with Dr. Fernando on June 5.  (Id. at 290-91.)  Her weight had increased by only 4.5 pounds in the past year.  (Id. at 290.)  She was on the B honor roll.  (Id.)  She wanted to play soccer.  (Id. at 291.)

Ms. Hurte reported to Dr. Nair in October, that Plaintiff was eating "on the go."  (Id. at 231.)  She was concerned about Plaintiff's behavior and her high activity level at school.

_____

[11]See medLexicon, Zoloft (sertaline HCI), http://www.medilexicon.com/drugs/zoloft_319.php (last visited May 18, 2011).

(Id.)  On examination, Plaintiff was pleasant and made good eye contact.  (Id.)  Dr. Nair added ADHD to her diagnoses and Adderall, prescribed for the treatment of ADHD, to her prescriptions.  (Id.)  Plaintiff was to return in four months with her siblings.  (Id.)

On August 20, 2007, Plaintiff saw another pediatrician, Martha Margreiter, M.D., in Dr. Fernando's practice.  (Id. at 288-89.)  She was then taking Metformin,[12] Lipitor, Sertaline,[13] and Adderall.  (Id. at 288.)  Her diagnoses included metabolic syndrome,[14] hypercholesterolemia, ADHD, depression, upper airway obstruction, and epistaxis (nosebleeds).  (Id. at 289.)

In September, Plaintiff underwent a tonsillectomy.  (Id. at 281.)

A hearing test administered in October showed her hearing to be within normal limits. (Id. at 279.)

The ALJ also had before him an evaluation form completed by an agency employee, a questionnaire completed by a teacher, a questionnaire completed by a speech pathologist, and a report of a consultative examination.

---

[12]Metformin is prescribed for the treatment of people with Type II diabetes.  See Drugs.com, Metformin, http://www.drugs.com/search.php?searchterm=metformin (last visited May 18, 2011).

[13]Sertaline is the generic form of Zoloft.  See note 11, supra.

[14]Metabolic syndrome is "a constellation of conditions," including "type 2 diabetes, obesity, high blood pressure, and a poor lipid profile with elevated LDL ('bad') cholesterol, low HDL ('good') cholesterol, elevated triglycerides."  MedicineNet.com, Definition of Metabolic syndrome, http://www.medterms.com/script/main/art.asp?articlekey=32619 (last visited May 19, 2011).  "The fundamental defect in the metabolic syndrome is insulin resistance . . . ."  Id.

In April 2006, when Plaintiff was in second grade, her teacher, Loretta Ezell, completed a questionnaire on her behalf.[15]  (Id. at 162-69.)  She reported that Plaintiff was below level in reading and written language and was at level in math.  (Id. at 162.)  She was in a small reading group.  (Id.)  In the domain of acquiring and using information, Plaintiff had an obvious problem in five of the ten listed activities and a slight problem in five.[16]  (Id. at 163.)  In the domain of attending and completing tasks, she had a slight problem in nine of the thirteen activities and no problem in four.  (Id. at 164.)  In the nine in which she had a slight problem, the problems occurred daily in six of the activities and weekly in three. (Id.)  In the domain of interacting and relating with others, Plaintiff had an obvious problem in three of the thirteen activities; a slight problem in nine; and no problem in one.  (Id. at 165.)  Ms. Ezell noted that Plaintiff had made "very good improvements" in her playground and bus behaviors.  (Id.)  Plaintiff had no problem in the domains of moving about and manipulating objects and of caring for herself.  (Id. at 166-67.)  Ms. Ezell further noted that Plaintiff and her mother had begun the school year with very negative attitudes and that her mother had not been cooperative.  (Id. at 168.)  Her mother would complain that Plaintiff

---

[15]Social Security Ruling 06-03p considers teachers and other educational personnel as "non-medical sources" who may have close contact with claimants and who may be "valuable sources of evidence for assessing impairment severity and functioning."  Social Security Ruling 06-03p, 2006 WL 2329939, *3 (S.S.A. 2006).  Such sources often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  Id.

[16]The severity of the problem is rated on a five-point scale, ranging from "no problem" at one to "a very serious problem" at five.  An obvious problem is a three; a slight problem is a two.

could not read but would not help her at home.  (Id.)  Plaintiff did not have any discipline problems when she regularly took her medication.  (Id.)

That same month, Tracy Robison, CCC-SLP,[17] completed a Speech/Language Pathologist Questionnaire submitted to her pursuant to Plaintiff's SSI application.  (Id. at 175-76.)  She responded that none of the questions were applicable to Plaintiff.  (Id.)

A Childhood Disability Evaluation Form  was completed for Plaintiff in May 2006 by an agency employee.  (Id. at 261-66.)  The diagnoses were ADHD, major depressive disorder, and PTSD.  (Id. at 261.)  These impairments were serious but did not meet or equal an impairment of listing-level severity.  (Id.)  Specifically, they resulted in less than marked limitations in the domains of acquiring and using information, of attending and completing tasks, and of interacting and relating with others.  (Id. at 263.)  They caused no limitations in the domains of moving about and manipulating objects, caring for herself, and health and physical well-being.  (Id. at 264.)

In January 2008, Plaintiff underwent a psychological consultative examination pursuant to her SSI application.  (Id. at 318-21.)  Her relevant psychosocial history included frequent loss of temper, disobedience, argumentative with adults, resentful of authority, blaming others for her misbehavior, and easily annoyed.[18]  (Id. at 319.)  She had been placed on probation by the juvenile court after she stole a check from the school cafeteria.  (Id.)  She

---

[17]Certificate of Clinical Competency – Speech-Language Pathology.  See What does CCC-SLP stand for?,   http://www.acronymfinder.com/Certificate-of-Clinical-Competence-in-Speech_Language-Pathology (last visited May 5, 2011).

[18]Her medical records were not available for review.

also had a history of aggression toward other children.  (Id.)  The psychologist, Jonathan D.

Rosenboom, Psy.D., described his examination of Plaintiff as follows.

> At the time of the examination the client appeared as a tall, overweight, Caucasian female whose mood was noticeably irritable.  She reported her current height as 5'0" and her current weight as 135 pounds.  She made adequate and appropriate eye contact with this psychologist and scowled throughout the examination.  She appeared clean for the examination and was neatly, but casually dressed in blue jeans and a cream colored top.  She had dark brown hair and wore glasses.  The client's motor activity was notable for restlessness and annoying behaviors.  She loudly drummed her fingers on the table in front of her and kicked/scoffed her shoes on the carpeted floor.  Her speech was notable for being reduced in overall productivity probably due to her uncooperativeness during the examination.  When she did speak her speech was not notable for articulation errors or dysfluencies.  Her thoughts flowed evenly, logically, and in a goal-directed manner, not showing any signs of a formal thought disorder.

> The client was awake and alert, but her attention wandered during the examination.  She answered most questions that I put to her with, "I don't know."  During the interview, the client was somewhat evasive about her disruptive behavior, apathetic, negativistic, and uncooperative.  The content of her spontaneously produced thoughts was not notable for psychotic symptoms.  In addition to the oppositional/defiant symptoms reported earlier in the interview the client met several diagnostic criteria of a Conduct Disorder, including bullies/threatens/intimidates peers, starts fights, deliberate destruction of property, shoplifting, and theft.  Regarding any symptoms of a depressive disorder the client's mother reported that she "eats a lot and cries." There were no other reported signs or symptoms of a depressive disorder.

(Id. at 320.)  Dr. Rosenboom diagnosed Plaintiff with conduct disorder, childhood onset

type; depressive disorder, not otherwise specified, in substantial remission; and ADHD, in

substantial remission.  (Id.)  Her current GAF was 52.[19]  (Id.)

---

[19]See note 8, supra.

**The ALJ's Decision**

After noting that Plaintiff, a school-age child when the SSI application was filed, had clearly not engaged in substantial gainful activity at any relevant time, the ALJ concluded that she had severe impairments of oppositional defiant disorder, ADHD, depressive disorder, obesity, high cholesterol, and a metabolic disorder. (Id. at 14.) She did not have an impairment or combination of impairments that met or functionally or medically equaled an impairment of listing-level severity. (Id. at 15.) The ALJ further concluded that Plaintiff also had bipolar disorder, pancreas cell damage, and diabetes, Types I and II.[20] (Id. at 16.)

The ALJ then addressed Plaintiff's ability to function in the six domains, finding that she had (1) a less than marked limitation in the four domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and moving about and manipulating objects, and (2) no limitation in the two domains of caring for herself and health and physical well being. (Id. at 16-18.) The ALJ explained his reasoning as follows.

Addressing the first domain, acquiring and using information, the ALJ noted that Plaintiff was in an age-appropriate grade, had never been held back, was not in special education, and had an IQ within the average range. (Id. at 16.) Ms. Hurte reported that

---

[20]Type I diabetes, formerly also known as Insulin Dependent Diabetes or Juvenile Diabetes, is when there is "an absolute lack of insulin." DiabetesHome, Type 1 and Type 2 Diabetes, http://www.diabeteshome.ca/what-is-the-difference.php (last visited May 18, 2011). Insulin is present in Type II diabetes, formerly also known as Adult Onset Diabetes, but the amount available is less than is required and does not work as it should. Id.

Plaintiff did not have a problem learning; Plaintiff's teacher reported that she had some slight and obvious problems in this area but no serious problems. (Id.)

Addressing the second domain, attending and completing tasks, the ALJ noted that Plaintiff's ADHD had not prevented her from advancing in grade and had been described by the consulting psychologist as being in substantial remission. (Id. at 17.) Ms. Hurte reported that Plaintiff was limited in this domain; Plaintiff's teacher reported that she had some slight problems in the domain but no obvious, serious, or very serious problems. (Id.)

Addressing the third domain, interacting and relating with others, the ALJ found that, although Plaintiff had been suspended in the first grade for stealing and from the bus on multiple occasions, her teacher had reported that there were no problems when she took her medication. (Id.) Her mental status examinations were "fairly unremarkable," and her GAF of 55 reflected "variable functioning with sporadic difficulty in several areas but not all social areas." (Id.) The consulting psychologist stated that her ability to engage in age-appropriate activities was not impaired, but she choose to engage in problematic behaviors due to her oppositional behavior. (Id.)

Addressing the fourth domain, moving about and manipulating objects, the ALJ found that Plaintiff's high cholesterol was secondary to excess calories resulting from excess portions. (Id. at 17-18.) Her obesity was caused by a combination of genetic factors, inactivity, and overeating. (Id. at 18.) Aside from her obesity, her physical examinations were generally within normal limits. (Id.) Ms. Hurte and Plaintiff's teacher each reported

that Plaintiff did not have a problem in this domain.  (Id.)  The school indicated that Plaintiff

was delayed in her gross motor skills due to her obesity but not in her fine motor skills.  (Id.)

Addressing the fifth and sixth domains, the ALJ noted that Ms. Hurte and Plaintiff's

teacher reported that Plaintiff did not have any problem in the domain of caring for herself

and that there was "no evidence of any cumulative physical affects that were not considered

in the moving about and manipulating objects domain" and that caused any limitation in the

domain of health and physical well-being.  (Id.)

Because Plaintiff did not have a marked limitation[21] in at least two domains or an

extreme limitation[22] in at least one domain, she was not disabled within the meaning of the

Act.  (Id.)

### Additional Records Before the Appeals Council

In October 2008, Plaintiff's counsel, see note 2, supra, advised the Appeals Council

that Plaintiff had been awarded SSI beginning May 9, 2008.  (Id. at 188-205.)

Counsel also submitted several additional medical records for Plaintiff.  These

records, all from the Kneibert Clinic, list seven diagnoses for her.  In August 2007, Shaun

Ross, M.D., entered a diagnosis of dysmetabolic syndrome X[23]; dyslipidemia (high blood

---

[21]A child has a "marked" limitation in a domain when her impairment seriously interferes with her
ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2).  A
marked limitation is "a limitation that is 'more than moderate' but 'less than extreme.'"  Id.

[22]A child has an "extreme" limitation in a domain when her impairment "very seriously" interferes with
her ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(3).

[23]Also known as metabolic syndrome.  See note 14, supra.

cholesterol); and ADHD.  (Id. at 325-27.)  The dysmetabolic syndrome had an onset date of

November 2006; the dyslipidemia and ADHD had an onset date of August 2007.  (Id. at 325-

27.)  In April 2008, Naveed J. Mirza, M.D., listed diagnoses of major depressive disorder,

recurrent, mild; oppositional defiant disorder; Asperger's disorder; and developmental

dyslexia.  (Id. at 328-30.)  The first diagnosis had an onset date of August 2007; the other

three diagnoses had onset dates of April 2008.  (Id.)  For these conditions, Plaintiff was

prescribed Adderall, Metformin, Lipitor, docusate sodium (a stool softener), Singulair (for

asthma), Risperdal (an antipsychotic prescribed for, among other things, bipolar disorder),

and Zoloft.  (Id. at 323-24.)

## Legal Standards

Title 42 U.S.C. § 1382c(3)(C)(i) provides that "[a]n individual under the age of 18

shall be considered to be disabled for purposes of [SSI] if that individual has a medically

determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."

Under the Act, the ALJ inquires into (1) whether the child is currently engaged in

substantial gainful activity; (2) whether the child suffers severe impairments or a

combination of severe impairments; and (3) whether the child's impairments meet or equal

any listed impairments.  **Scott ex rel. Scott v. Astrue**, 529 F.3d 818, 821 (8th Cir. 2008);

**Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 647 (8th Cir. 2004); **Bryant ex rel.**

**Bryant v. Apfel**, 141 F.3d 1249, 1251 (8th Cir. 1998).  If the ALJ finds at step two of the

evaluation that a child's impairments are severe, as in the instant case, then the question at step three is whether those severe impairments (a) cause "marked" limitations in two of six domains and or an "extreme" limitation in one and (b) meet the duration requirement of at least one year.  20 C.F.R. § 416.926a(d); accord **England v. Astrue**, 490 F.3d 1017, 1020 (8th Cir. 2007) (citing 20 C.F.R. § 416.926a(a)).  The six domains are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence.  **Rucker for Rucker v. Apfel**, 141 F.3d 1256, 1259 (8th Cir. 1998); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl v. Shalala**, 47 F.3d 935, 937 (8th Cir. 1995).  "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's decision.'"  **England**, 490 F.3d at 1019 (quoting Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision.  **Id.**; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion.  **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998).  See also **Reed v. Sullivan**, 988

F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (internal quotations omitted)).

**Discussion**

Plaintiff argues that the ALJ erred by not specifying what portions of the medical record he was relying on when determining the severity of Plaintiff's impairments. Plaintiff specifically challenges the ALJ's failure to define the metabolic disorder he found to be severe and to clarify whether this disorder was the islet cell condition, see note 3, supra, referred to in the hearing by Ms. Hurte. The Commissioner disagrees, countering that the ALJ's findings in each of the domains is supported by the record and that, aside from Ms. Hurte's vague reference to islet cell during the hearing, no further evidence of such a condition has been produced.

"'[S]ocial security hearings are non-adversarial,' and an ALJ has a duty to fully develop the record . . . ." **Johnson v. Astrue**, 627 F.3d 316, 319 (8th Cir. 2010) (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)) (first alteration in original). This duty includes "recontact[ing] a treating or consulting physician if a critical issue is undeveloped." **Id.** at 320. If, however, a crucial issue is not undeveloped, there is no duty to recontact or seek clarifying statements from a treating physician. **Id.**; **Jones v. Astrue**, 619 F.3d 963, 969 (8th Cir. 2010). Nor is the ALJ "'obliged to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" **Halverson v. Astrue**, 600 F.3d 922, 934 (8th Cir. 2010) (quoting Mouser v. Astrue, 545

F.3d 634, 639 (8th Cir. 2008)), or to "'discuss every piece of evidence submitted,'" **Wildman**

**v. Astrue**, 596 F.3d 959, 966 (8th Cir. 2010) (quoting <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th

Cir. 1998)).

      The ALJ determined that Plaintiff had severe impairments of oppositional defiant

disorder, ADHD, depressive disorder, obesity, high cholesterol, and a metabolic disorder,

and also had bipolar disorder, pancreas cell damage, and Types I and II diabetes.  Plaintiff

was first prescribed an anti-depressant when she was six years old and at a time when her

activity and peer involvement were considered to be within normal limits.  That same year,

the dosage was doubled, and she was diagnosed by another doctor with a mood disorder.

Her GAF was 55.  Two months later, her GAF was 50.  Two months after that, an

antipsychotic medication, Abilify, was added to her prescriptions.  Five months later, her

antidepressant medication was increased by 50%.  She was described as not having any

behavior problems; however, three weeks later, she reportedly stole a check from the school

cafeteria.  She was also diagnosed with PTSD.  Five months later, she was prescribed a

different medication, Zoloft.  Later that same year, when she was in third grade, she was

diagnosed with ADHD.

      Just as her prescriptions changed, so too did her diagnoses.  She was thought by one

psychiatrist to have a mood disorder.  This same psychiatrist was to consider whether

Plaintiff had a depressive disorder as opposed to a bipolar disorder.  The next time Plaintiff

saw this psychiatrist, the possibility of a bipolar disorder had increased.  Without a further

finding, her pediatrician reported Plaintiff as having bipolar disorder the next time he saw

her.  The next diagnosis of Plaintiff was by a different psychiatrist.  This psychiatrist diagnosed her with PTSD and major depressive disorder.  The latter was the same diagnosis the first psychiatrist considered to be inconsistent with a bipolar disorder.  The next time Plaintiff saw this second psychiatrist, she was prescribed a medication recommended for children with obsessive-compulsive disorder.  This psychiatrist later diagnosed Plaintiff with ADHD.  The next medical record is dated ten months later.  Another pediatrician included a metabolic syndrome in Plaintiff's list of diagnoses.  Also in the list was ADHD and depression.

 At least one year later, the consulting psychologist diagnosed Plaintiff with a conduct disorder.  Two other diagnoses, both of which had been made by a treating psychiatrist, were described as being in substantial remission.  This psychologist had not reviewed Plaintiff's medical records.  His exam appears to have consisted of interviews with Plaintiff and her mother.  And, as is evident from the report of that examination, the interview with Plaintiff was colored by her uncooperative attitude.

Although Plaintiff's diagnoses had shifted about, along with the medications prescribed to address the related symptoms, the ALJ did not recontact either treating psychiatrist to determine whether Plaintiff had a depressive disorder, bipolar disorder, or oppositional defiant disorder.  Rather, he found she had all three.  He relied on the consulting psychologist's opinion that the depressive disorder and the ADHD were in substantial remission but did not include the psychologist's diagnosis of a conduct disorder in Plaintiff's list of impairments.

The ALJ also found that Plaintiff had a metabolic syndrome, pancreas cell problems, and Types I and II diabetes, although (a) a metabolic syndrome may include Type II diabetes, (b) he did not define the pancreas cell problems, including whether the problems were an islet cell tumor, and (c) he did not explain how a person could have both Type I and II diabetes. The ALJ did not send Plaintiff for a consultative examination for an evaluation of her insulin-related problems,[24] but found her to have no limitations in the domain of health and physical well being other than the affect her weight has on the development of her gross motor skills.

Because of the above-described inconsistencies, the Court is unable to determine whether substantial evidence supports the ALJ's conclusions about Plaintiff's level of functioning in the six domains.

## Conclusion

Plaintiff may well not have been disabled within the meaning of the Act between April 2006, when the instant application was filed, and May 2008, when a latter, successful application was filed. The ALJ's decision that she was not, however, is not supported by substantial evidence on the record as a whole. The case should be remanded to the Appeals

---

[24]The Commissioner correctly notes that there is no medical evidence in the record to support Ms. Hurte's testimony that Plaintiff's "pancreas cells are dying." (R. at 29.) Ms. Hurte further testified that Plaintiff has a combination of Type I and Type II diabetes. (Id.) The ALJ found that Plaintiff and pancreas cell problems and both juvenile-onset and adult-onset of diabetes. See note 20, supra. Having apparently accepted Ms. Hurte's testimony about these conditions, the ALJ did not further inquire into their symptoms or resulting limitations. The undersigned notes that Ms. Hurte, with bipolar disorder, depression, and anxiety, was not represented in the proceedings prior to and at the time of the ALJ's decision.

Council with directions to remand it to an ALJ to recontact one of Plaintiff's psychiatrists for her diagnosis and to send Plaintiff for a consultative examination to determine what, if any, metabolic disorder or pancreatic condition she has. Accordingly,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be REVERSED and the case be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings as set forth above.

The parties are advised that they have **fourteen days from this date** by which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. <u>See</u> **<u>Griffini v. Mitchell</u>**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  23rd  day of  May, 2011.